THE CHICAGO UNION TRACTION COMPANY*

*v.*

THE CITY OF CHICAGO.

*Opinion filed June 14, 1906.*

1. SPECIAL ASSESSMENTS—*substantial compliance with section 8 of Improvement act is sufficient.* Substantial compliance with section 8 of the Local Improvement act, requiring the ordinance to prescribe the nature, character, locality and description of the improvement, is all that the law requires.

2. SAME—*when term "asphaltic cement" is not uncertain.* The use of the term "asphaltic cement" does not render a paving ordinance uncertain even though the proportion of the ingredients is not expressly specified, where it is proven that the term has a well understood and defined meaning among contractors familiar with asphalt paving, and that the proportion of the ingredients must be varied to suit climatic conditions and the quality of asphalt used, and where the ordinance requires all work to be done in a workmanlike manner.

APPEAL from the County Court of Cook county; the Hon. WILLIAM L. POND, Judge, presiding.

WILLISTON FISH, (JOHN A. ROSE, of counsel,) for appellant.

CHARLES H. MITCHELL, and FRANK JOHNSTON, Jr., (JAMES HAMILTON LEWIS, Corporation Counsel, and ROBERT REDFIELD, of counsel,) for appellee.

Mr. JUSTICE WILKIN delivered the opinion of the court:

The city council of the city of Chicago passed three ordinances for the construction of asphalt pavements,—on Clifton avenue from Fullerton avenue to Center street, on West Fourteenth street from South Halsted to South Wood street, and on Ogden avenue from South Albany avenue to South

---

*Consolidated case, being Nos. 4777, 4779 and 4780.

Fortieth avenue. Upon application for confirmation of the assessment rolls objections were filed by appellant, which were overruled by the court and judgments entered. To reverse these judgments appeals have been prosecuted to this court. As the questions involved in each case are identical, the cases have been consolidated and will be considered together.

Each ordinance provided that the street should be first graded. Upon the road-bed thus prepared was to be spread a layer of Portland cement concrete six inches thick. Upon this foundation was to be laid a binder course, composed of broken limestone of a size known as small concrete, and asphaltic cement. The stone was to be heated and thoroughly mixed with the cement in a proportion of fifteen gallons of cement to one cubic yard of stone. This binder course was to be spread, and while in a hot and plastic condition rolled until it had a uniform thickness of one and one-half inch, and on it was to be laid the wearing surface or pavement proper, composed of asphaltic cement seventeen parts, sand seventy-three parts and pulverized carbonate of lime ten parts. The sand and asphaltic cement were to be heated separately to a temperature of three hundred degrees Fahrenheit. The pulverized carbonate of lime was to be mixed with the sand and these ingredients then mixed with the asphaltic cement at the above temperature, in an apparatus which should effect a perfect mixture. All asphaltum used in making the asphaltic cement for both the binder course and wearing surface was to be obtained from Pitch lake, in the Island of Trinidad, or was to be asphaltum of equal quality. The entire surface of the roadway after completion was to be compressed by hand-rollers, after which natural hydraulic cement in the proportion of one barrel to each one thousand square yards of surface was to be spread over it, and the whole thoroughly compressed by rolling with a steam-roller of ten tons weight, the rolling to continue for five hours for each one thousand square yards of surface.

The objection to the ordinances is, that they do not specify the nature, character, location and description of the proposed improvement, particularly with reference to the binder course and wearing surface of the pavement, in that they provide that asphaltic cement shall be used, and there is nothing in the ordinance to show definitely how such cement is to be made or the ingredients of which it is to be composed.

Section 8 of the Local Improvement act of 1897 (Hurd's Stat. 1897, p. 356,) provides that the ordinance for the improvement shall prescribe the nature, character, locality and description of such improvement, etc. It is insisted that the ordinances in question do not comply with the requirements of that section. This section has been before us on many occasions, and we have uniformly held that a substantial compliance with its terms is all that is necessary. Thus, in the case of *Peters* v. *City of Chicago,* 192 Ill. 437, we said: "We have many times decided that while an ordinance for a local improvement must conform to the statute as to a description of the improvement, a substantial compliance with the statutory provisions is all that is necessary. It is not essential that the details and all the particulars of the work should be stated. The object of the statute is to enable the parties to intelligently estimate the cost of the work, and also to afford parties interested the opportunity of judging whether the improvement is made according to the requirements of the ordinance." In the case of *Sawyer* v. *City of Chicago,* 183 Ill. 57, we said: "After the bricks are laid the spaces between them are to be filled with coal-tar residuum paving cement, delivered on the work at a temperature of three hundred degrees Fahrenheit, and it is claimed that this may mean that the material shall be brought to the place at the specified temperature but may be put on the pavement after it is cooled. The only sensible meaning is, that the material shall be put on the pavement at the specified temperature." See, also, *Smythe* v. *City of Chicago,* 197 Ill.

311; *Duane* v. *City of Chicago,* 198 id. 471; *Gage* v. *City of Chicago,* 201 id. 93; *Walker* v. *City of Chicago,* 202 id. 531; *Chicago Union Traction Co.* v. *City of Chicago,* 215 id. 410.

Upon the hearing, evidence was offered for the purpose of ascertaining whether the description in the ordinance substantially designated the character of the improvement. Samuel G. Artinstall, a witness on behalf of the objector, testified that he had formerly been the city engineer of the city of Chicago for several years, and had experience in the construction of asphalt pavements but had no practical experience with asphalt cement, but knew what it was; that it was a mixture of asphalt with other ingredients and substances; that asphalt, in its natural condition, is brittle under ordinary temperature and requires some solvent to make it adhesive and pliable; that the solvents used are of various kinds, including residuum oil, gas-tar, and liquid asphaltum or bitumen; that the character of the cement produced depends upon the kind of asphalt, the quality and quantity of the solvent and the climate in which it is to be used; that the residuum is obtained from oil, and is the part left after the kerosene, gasoline and other oil products have been abstracted; that from twenty to thirty pounds of residuum is generally used to each one hundred pounds of refined asphalt; that the quantity depends upon the hardness of the asphalt, which varies in this respect in different localities, but the variance is not very great from the same locality but is quite great from different localities; that it would be impracticable to exactly specify the proportions of ingredients required to make asphalt cement, but if the asphalt comes from Pitch lake, in the Island of Trinidad, they might be specified within a narrow limit.

Henry Kassom, a witness called on behalf of the petitioner, testified that he was the vice-president of the Barber Asphalt Paving Company, had been in its employ for twenty years, and had constructed seventy-five miles of asphalt pave-

ment in the city of Chicago; that the term "asphaltic cement" has a definite and certain meaning; that it is made by taking refined asphalt and adding a certain proportion of flux to it; that the purpose of the flux is to bring the refined asphalt to a certain degree of softness or ductility and to make it adhesive; that the flux, termed "residuum," is a paraffine flux obtained in Pennsylvania, Ohio, and in other places; that under the terms of the ordinance in question you can get a definite result with the asphaltic cement specified, —that is, you have to get certain definite results; that it is necessary to vary the proportion of flux to a small extent, depending upon the changes in heat, the character of the asphalt itself and the place in which it is to be used; that it would be impossible to fix the definite and exact percentage of the amount of the flux; that if the proportions were not made so as to soften the asphalt to the proper condition then improper and bad results would follow, but if done in a workmanlike manner, under the terms of the ordinance, it would not make any difference what kind of flux was used to bring the desired result.

H. D. Hill, also a witness on behalf of the objector, testified that he had been a civil engineer for thirty years, and had been since 1901 the engineer of the board of local improvements of the city of Chicago; that the most of his knowledge of asphaltic cement had been obtained from reading scientific works, as he had had no actual experience in its handling; that there is a difference between asphaltic cement used in the binder course and in the wearing surface; that the asphaltic cement is made from asphalt mixed with fluxing oil, and that in the use of Trinidad asphalt to one hundred pounds of asphalt would be added about twenty pounds of residuum of petroleum oil as a flux, and this would produce an asphaltic cement which would be proper for the wearing surface, and that the difference between the wearing surface and the binder course is so slight that it would be hard to vary the proportions.

Other evidence tends to show that the proportions of the mixture are not only varied by the character of the asphalt used, but also by the conditions of the climate in which it is to be used as well as by the character of the traffic upon the street on which it is placed. This testimony is uncontradicted.

Where it is proven, on the hearing of objections, that the descriptive terms used in the ordinance for a public improvement have a well known and established meaning, any apparent defect or omission in the description will be removed. (*Kuester* v. *City of Chicago,* 187 Ill. 21; *Beckett* v. *City of Chicago,* 218 id. 97; *Holden* v. *City of Chicago,* 212 id. 289.) From the foregoing evidence it appears that the term "asphaltic cement" has a well known meaning among those familiar with the construction of asphalt pavements. While the specific proportion of each ingredient necessary to its production does not appear in express terms, yet taking into consideration the language used in the rest of the ordinances and the results sought to be obtained there can be no doubt as to the meaning intended. It was the purpose of the city to put down a good and substantial pavement which would be of service to the public for many years. Asphalt from Pitch lake, or its equivalent in quality, was to be used. This asphalt had well known properties. It was also to be the basis of the asphaltic cement. The purpose of the asphaltic cement in the binder course was to firmly fasten together the cement foundation and the wearing surface. The wearing surface was to be durable and lasting. *All of the work was to be done in a workmanlike manner.* If improper proportions or materials were used in the asphaltic cement these results would not be accomplished and the contractor would not be complying with the terms of the ordinance. Taking into consideration all of the facts and circumstances appearing in the case we are of the opinion that the terms used in the ordinances specifically designated the kind and character of cement to be used within the re-

quirements of the statute, and that the rights of the property owners were fully protected.

No reversible error appearing, the judgments of the county court will be affirmed.          *Judgments affirmed.*